IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ANDREW U.D. STRAW,
    *Plaintiff*,

    v.                             Civil Action No. ELH-19-2294

U.S. DEPARTMENT OF STATE,
    *Defendant.*

**MEMORANDUM OPINION**

This litigation is rooted in the denial of a visa to a foreigner who was to serve as a medical escort for an American citizen returning from the Philippines to the United States.

Plaintiff Andrew Straw, a United States citizen currently residing in the Philippines, applied for a loan from the United States Department of State (the "State Department") through a program that repatriates destitute citizens located abroad.  Mr. Straw asserts that he has severe physical and mental disabilities and requested funds to cover the travel costs of his Filipina home-health aide, Leslie Castigador Tabbada, so that she could serve as his medical escort. However, the State Department denied Ms. Tabbada's visa request, rendering her ineligible to act as plaintiff's escort.  Thereafter, on August 8, 2019, Mr. Straw filed suit against the State Department, alleging, *inter alia*, discrimination and a denial of due process.  ECF 1 (the "Complaint"); ECF 1-2 (Straw Affidavit).

Plaintiff, who is a self-represented lawyer,[1] seeks damages as well as injunctive and declaratory relief.  In Count I, Mr. Straw asserts a claim for violation of his rights to substantive

---

[1] Plaintiff is an active member of the Virginia bar and is admitted to practice before the Fourth Circuit.  *See* ECF 1-2, ¶¶ 24-25. *see also* Fed. R. Evid. 201; *Andrew U.D. Straw*, VIRGINIA LAWYER DIRECTORY, https://bit.ly/2xNHqpU (last accessed May 7, 2020); *Active Attorneys*, UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT, https://bit.ly/3dlRntE (last accessed May 7, 2020).

due process under the Fifth Amendment to the Constitution, pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). *See* ECF 1, ¶¶ 16-17. He seeks damages of $52,000. *Id.* ¶ 18. Count II alleges that the State Department is liable in the amount of $1,000,000 for violations of the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691 *et seq.*, and the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794 *et seq.* ECF 1, ¶¶ 19-22. Plaintiff also seeks various declarations, including a ruling that "denying a severely disabled person an escort" is "discrimination on its face." *Id.* ¶ 27. And, plaintiff seeks an injunction compelling the State Department to issue Ms. Tabbada "a B1 visa with a full 12-month time period." *Id.* ¶ 29.

On October 16, 2019, Mr. Straw filed a "Motion For Permission To Include Judiciary Act of 1925 Declaration In Amended Complaint." ECF 17 (the "Motion to Amend"). In his submission, plaintiff seeks to amend his suit to include a claim that the Judiciary Act of 1925, as amended, 28 U.S.C. § 1254, violates "due process … under the Fifth Amendment, the First Amendment, and Article III [of the Constitution]." ECF 17, ¶ 5.

---

A cursory search on Westlaw reveals Mr. Straw to be a prolific if unsuccessful litigator. He is identified as a plaintiff in over fifty judicial opinions. In the first half of 2020 alone, the federal courts have dismissed five cases filed by Mr. Straw. *See Straw v. Wolters Kluwer United States, Inc.*, 20-CV-3251 (LLS), 2020 WL 2115177 (S.D.N.Y. May 1, 2020); *Straw v. Harris*, No. C20-0410RSL, 2020 WL 2063560 (E.D. Wash. Apr. 28, 2020); *Staw v. Avvo, Inc.*, No. C20-0294JLR, 2020 WL 1182932 (W.D. Wash. Mar. 11, 2020); *Straw v. North Carolina*, 7:18-cv-00074-M, 2020 WL 1042141 (E.D.N.C. Mar. 3, 2020), *appeal docketed* No. 20-1295 (4th Cir. Mar. 12, 2020); *Straw v. Indiana*, SAG-19-3034, 2020 WL 231071 (D. Md. Jan. 14, 2020).

Notably, the Indiana Supreme Court disciplined Mr. Straw in 2017 for filing frivolous cases, suspending his law license for 180 days. *See In re Straw*, 68 N.E.3d 1070, 1071, 1073 (Ind. 2017), *cert. denied sub nom. Straw v. Indiana Supreme Court*, ___ U.S. ___, 137 S. Ct. 2309 (2017). It appears that plaintiff's Indiana law license remains suspended. *See Andrew U.D. Straw*, INDIANA ROLL OF ATTORNEYS, https://bit.ly3drYEbA (last accessed May 7, 2020).

Then, on November 14, 2019, prior to discovery, plaintiff filed a motion for summary judgment under Fed. R. Civ. P. 56. ECF 20. It is supported by a memorandum of law. ECF 20-1 (collectively, the "Straw S.J. Motion").

On December 6, 2019, the government filed a motion to dismiss under Fed. R. Civ. P. 12(b)(1) and 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. ECF 24. The motion is supported by a memorandum of law (ECF 24-1) (collectively, the "Government Motion") and one exhibit. ECF 24-2. Plaintiff filed a consolidated response to the Government Motion (ECF 25) (the "Opposition"), along with six exhibits. ECF 27-1 to ECF 27-6.[2] The government replied on January 9, 2020. ECF 31.

Since then, Mr. Straw has flooded the Court with additional filings. These include a "Notice" accusing the government of "mislead[ing] the Court" in its reply (ECF 32); "Motion To Take Notice" (ECF 33); "Motion for Declaratory Judgment," contesting the government's interpretation of the Rehabilitation Act (ECF 36); "Motion To Take Notice Of Leslie C. Tabbada's 'Starving Artist' Status And O Visa Application, *Inter Alia*" (ECF 37); "Motion To Take Notice Of Rule 8(b)(6) Applied To The Declaratory Judgment Motion And Proposed Order And Motion To Take Judicial Notice" (ECF 38); and several "Notice[s]" on topics including Mr. Straw's family history, disabilities, prior litigation, and health status in light of the COVID-19 pandemic. ECF 40; ECF 41; ECF 42; ECF 43; ECF 44; ECF 45. The government opposes these filings to the extent that they constitute surreplies. ECF 34; ECF 39. Plaintiff has replied to the government's oppositions. ECF 35; ECF 41.

---

[2] Plaintiff also filed a "Notice" on December 7, 2019, observing that I was once (many years ago) an Assistant United States Attorney in the District of Maryland and citing 28 U.S.C. § 455, without elaboration. ECF 26.

No hearing is necessary to resolve the various motions.  *See* Local Rule 105.6.  For the reasons that follow, I shall deny the Motion to Amend (ECF 17).  In addition, I shall deny ECF 33, ECF 36, ECF 37, and ECF 38 as improper surreplies.  And, I shall construe the Government Motion (ECF 24) as one for summary judgment, and I shall grant it.  Conversely, I shall deny the Straw S.J. Motion (ECF 20).

## I.    Background

### A.  The Repatriation Loan Program

The State Department Basic Authorities Act of 1956, as amended, 22 U.S.C. § 2651 *et seq.*, authorizes the Secretary of State "to make expenditures, from such amounts as may be specifically appropriated therefor, for unforeseen emergencies arising in the diplomatic and consular service."  22 U.S.C. § 2671(a)(1).  Pursuant to this grant of authority, the Secretary may issue "loans . . . to destitute citizens of the United States who are outside the United States . . . to provide for the return to the United States of its citizens."  *Id.* § 2671(b)(2)(B).

Administration of the repatriation loan program in governed by the State Department's Foreign Affairs Manual (the "FAM" or "Manual").  Along with the State Department's handbooks, the Manual "convey[s] codified information to Department staff and contractors so they can carry out their responsibilities in accordance with statutory, executive, and Department mandates."  *Foreign Affairs Manual and Handbook*, U.S. DEP'T OF STATE, http://fam.state.gov/; *see also Sheikh v. U.S. Dep't of Homeland Sec.*, 685 F. Supp. 2d 1076, 1090 (C.D. Cal. 2009) ("FAM contains the functional statements, organizational responsibilities, and authorities of each of the major components of the U.S. Department of State, including Consular Officers.").

Pursuant to the FAM, the issuance of repatriation loans is purely discretionary.  *See* 7 FAM § 371(c) (Dec. 18, 2019) (providing that the State Department "may at its discretion, but

is not required to, provide a repatriation loan to an eligible U.S. citizen and/or accompanying family member(s)").  In assessing whether an applicant warrants a repatriation loan, consular officers, in conjunction with the Bureau of Consular Affairs, Directorate of Overseas Citizens Services, Office of American Citizens Services and Crisis Management (the "ACS"), must examine nine "eligibility factors."  *Id.* § 373(e).  These include: (1) nationality; (2) prior residence in the United States; (3) destitution; (4) accompanying family members; (5) accompanying escorts; (6) medical repatriation eligibility; (7) absence of a social security number; (8) ineligibility based on military status; and (9) ineligibility based on the applicant being a merchant seamen.  *See id.*

In order for an applicant to qualify for a loan, the consular officer "must determine that the applicant is destitute."  *Id.* § 375.2(b).  An applicant qualifies as "destitute" if he or she has "little or no visible means of support or liquid assets"; "no family, friends, neighbors, employers, charitable groups, etc., willing and able to provide adequate financial assistance"; "inadequate food or shelter"; and "no funds available to him or her to pay for the cost of repatriation."  *Id.* To determine whether an applicant is in fact destitute, the consular officer "must" interview the citizen and obtain the names and contact information "of at least" three individuals in the United States who may be able to provide the applicant with financial assistance.  *Id.* § 373.2(c)(1).

Moreover, the consular officer must make a good faith effort to obtain funds from these sources before recommending the applicant for a loan.  *Id.* § 373.2(c)(2). The FAM provides: "If the consular officer is not satisfied that an applicant(s) is destitute, the officer may decline to provide repatriation loan services to the applicant(s) and should notify the [ACS] country officer of the decision."  *Id.* § 373.2(c)(1).

Before the applicant obtains a loan, he or she must satisfy "all of the eligibility requirements" and sign a completed loan application. *Id.* § 375.2(b). Further, the FAM directs consular officers to "manage public monies expended on behalf of destitute citizens responsibly," *id.* § 376.3(d)(1), and to accomplish repatriation "by the least expensive means available." *Id.* § 371.5(a).

The Manual provides that repatriation loans may be used to cover not only the citizen's transportation costs but also expenses "incidental to the return of the individual," *id.* § 371(i), including the travel costs of an escort. *Id.* § 371(i)(6). An escort "may be required," for example, where the applicant is an unaccompanied citizen minor, physically or mentally disabled, or elderly. *Id.* § 374.4(a). In such circumstances, the repatriation loan may include the costs of an escort's travel and a per diem to the last U.S. city where the citizen will be received by local authorities or family members. *Id.* § 374.4(e). However, the Managing Director for Overseas Citizens Services must approve any escort fee greater than $1,000. *Id.* § 374.4(f).

As the signatory of the loan, the applicant has the "right to concur in the selection of the escort, based on information provided by the consular officer and subject to airline restrictions and attending physician recommendations." *Id.* § 374.4(c). But, the applicant's choice of escort is not unlimited: "Escorts must either be U.S. citizens, already have their U.S. visa, or be visa-eligible aliens." *Id.* § 374.4(b).

## B.  Plaintiff's Repatriation Loan Application[3]

Mr. Straw is a United States citizen. ECF 1-2, ¶ 5. Plaintiff avers that he has "severe physical and mental disabilities," ECF 1, ¶ 4, as a result of birth defects and a "head-on" car

---

[3] The followings facts are largely drawn from the Affidavit of Yolanda Parra, the Director of American Citizens Services, Office of Overseas Citizens Services in the Bureau of Consular Affairs at the State Department. ECF 24-2, ¶ 1. Mr. Straw does not dispute these facts in his Opposition.

accident that occurred in 2001.  *See id.* ¶¶ 4-14; ECF 1-2, ¶ 4; ECF 25, ¶¶ 5, 8, 17; ECF 25-1 to

ECF 25-6.  Among other issues, plaintiff underwent an "amputation of the top portion of [his]

right femur in 2012 . . . ."  ECF 1-2, ¶ 4.  The government does not dispute that Mr. Straw is

disabled.  *See* ECF 31 at 2.

Although it is unclear when Mr. Straw left the United States, he currently resides in the

Philippines.  ECF 1, ¶ 2.  According to plaintiff, Leslie Castigador Tabbada, a citizen of the

Philippines, serves as his home-health aide.  *Id.* ¶¶ 6-7.[4]

On March 21, 2019, the United States Embassy to the Philippines received

correspondence from Mr. Straw referencing a repatriation loan, a visa application for Ms.

Tabbada, and his desire for Ms. Tabbada to live with him upon his relocation to the United

States.  ECF 24-2 (Affidavit of Yolanda Parra), ¶ 2.  According to the government, ACS spoke

with Mr. Straw on April 11, 2019, and requested a Privacy Act Waiver ("PAW") so it could

begin contacting friends and family to seek financial assistance, as required by the FAM before

deeming a citizen destitute and therefore eligible for a repatriation loan.  *Id.* ¶ 3.  The same day,

the ACS unit in Manila received Mr. Straw's PAW and began reaching out to his contacts.  *Id.*

¶ 4.  On May 22, 2019, ACS deemed Mr. Straw destitute and encouraged him to apply for a

repatriation loan.  *Id.*

Mr. Straw submitted an application on May 23, 2019, using an outdated version of the

application form.  *Id.* ¶ 5; *see* ECF 1-2, ¶ 5 (Mr. Straw alleging that he applied for a loan in May

2019).  He also submitted an Addendum, dated March 18, 2019, along with his application.  ECF

24-2, ¶ 5; *see id.* at 7-20 (Addendum).  In the Addendum, Mr. Straw explained that he sought a

---

[4] It appears that their relationship is not platonic, as Mr. Straw refers to Ms. Tabbada in his Opposition as his "***potential spouse***."  ECF 25, ¶ 27 (emphasis in original); *see id.* ¶ 60 (alleging that he wishes to travel to the United States so he and Ms. Tabbada can marry).

loan to cover the cost of travelling from Bauan, Philippines, where he lives, to Montpelier, Vermont, where he hoped to reside and had already applied for public housing. *Id.* at 7. Further, plaintiff stated that the loan should cover the travel costs of his escort, Ms. Tabbada, who had been "helping [him] with medical and daily living needs since June of 2018." *Id.* at 8. As to Ms. Tabbada, Mr. Straw sought $1,500 in escort fees, a $900 per diem for 3 days of travel, $1,300 for round-trip airfare with an "indefinite" return date, and a nonimmigrant business visa (a "B1 visa"). *See id.* at 9. In total, plaintiff requested that the State Department lend him $3,760 to cover Ms. Tabbada travel expenses. *Id.* at 19. The following day, on March 24, 2019, upon the request of ACS, Mr. Straw submitted the correct version of the form. *Id.*; *see* ECF 24-2 at 21-22 (5/24/2019 DS-3072 Form).

On June 3, 2019, Mr. Straw submitted a medical certificate from his doctor stating that he was fit to travel to the United States. *Id.* ¶ 6. Ms. Tabbada "had an appointment for her B1 visa on June 7, 2019." ECF 1-2, ¶ 9. The same day, Mr. Straw spoke with ACS concerning his request for a medical escort. *Id.* ¶ 7. The consular officer informed Mr. Straw that without medical documentation demonstrating the need for a medical escort, the State Department could not cover Ms. Tabbada's travel costs. *Id.* According to the government, Mr. Straw responded that he would provide additional documents to support his request for an escort. *Id.*

However, the government maintains that Mr. Straw never transmitted the requested medical documents. *Id.* ¶ 9. Instead, between June 7 and June 12, 2019, Mr. Straw sent "multiple correspondence" to ACS threatening to sue if the State Department did not make arrangements for Ms. Tabbada to serve as his escort. *Id.* ¶ 10.

On June 13, 2019, Mr. Straw asked ACS when he could depart if he abandoned his request for funds to cover Ms. Tabbada's travel costs. *Id.* ¶ 11. ACS informed Mr. Straw the

same day that his repatriation loan would cover his transportation and incidental expenses, but no other costs. *Id.* ACS indicated that if Mr. Straw was interested in proceeding, he could depart as early as the next week. *Id.* Mr. Straw responded on June 14, 2019, that he would cover the cost of Ms. Tabbada's travel to the United States and therefore needed time to make arrangements. *Id.* ¶ 12.

On July 2, 2019, Mr. Straw reported to ACS that Ms. Tabbada's visa had been denied. *Id.* ¶ 15; *see* ECF 1-2, ¶¶ 38-39, 41 (Mr. Straw averring that Ms. Tabbada's visa was denied). Mr. Straw reiterated his threat to sue the State Department and also requested to be flown to New Zealand, instead of the United States. ECF 24-2, ¶ 16. However, ACS explained that repatriation assistance was available only for travel to the United States. *Id.*

On July 5, 2019, Mr. Straw canceled his repatriation loan. *Id.* ¶ 19; *see id.* at 25 (7/5/2019 email). He stated, *id.* at 25: "The Repatriation Loan has left me feeling humiliated, not just destitute." Therefore, plaintiff informed the State Department that he wished to "completely withdraw all authorization to purchase anything under the program and my application I filed earlier." *Id.*

This lawsuit followed on August 8, 2019. ECF 1.

## II.    Plaintiff's Motions at ECF 33, 36, 37, and 38

Following the briefing of the dispositive motions, plaintiff submitted the following filings: a "Motion To Take Notice" (ECF 33); "Motion for Declaratory Judgment" concerning the Rehabilitation Act (ECF 36); "Motion To Take Notice Of Leslie C. Tabbada's 'Starving Artist' Status And O Visa Application, *Inter Alia*" (ECF 37); and a "Motion To Take Notice Of Rule 8(b)(6) Applied To The Declaratory Judgment Motion And Proposed Order And Motion To Take Judicial Notice." ECF 38.

The government contends that the Court should decline to entertain these motions on the ground that they are improper surreplies, citing Local Rule 105.2(a).  ECF 34; ECF 38. According to defendant, plaintiff's motions "merely rehash[] arguments previously made" and contain "purported facts [that] are not relevant to the issues before this Court." ECF 34 at 3.

I agree with the government that although Mr. Straw's filings are captioned as motions, they are best characterized as surreplies.  Much of the information contained in plaintiff's submissions are beyond the scope of the instant dispute.  *See, e.g.*, ECF 37 (describing Ms. Tabbada's artistic talents).  However, to the extent that plaintiff's filings address the merits of his case, they attack arguments pressed by defendant in the Government Motion.  For instance, ECF 33 responds to defendant's contentions that the Rehabilitation Act does not have extraterritorial reach and that a *Bivens* claim cannot lie against a federal agency.  *Compare* ECF 24 at 12-13 and ECF 31 at 4-6, *with* ECF 33 at 7-8.  Likewise, ECF 36 relitigates the extraterritorial reach of the Rehabilitation Act.

Local Rule 105.2(a) provides that a party is not permitted to file a surreply without permission of the court.  The filing of a surreply "is within the Court's discretion, *see* Local Rule 105.2(a), but they are generally disfavored." *EEOC v. Freeman*, 961 F. Supp. 2d 783, 801 (D. Md. 2013), *aff'd in part*, 778 F.3d 463 (4th Cir. 2015); *see e.g.*, C*hubb & Son v. C & C Complete Servs., LLC*, 919 F. Supp. 2d 666, 679 (D. Md. 2013).  A surreply may be permitted when the party seeking to file the surreply "would be unable to contest matters presented to the court for the first time" in the opposing party's reply.  *Clear Channel Outdoor, Inc. v. Mayor & City Council of Baltimore*, 22 F. Supp. 3d 519, 529 (D. Md. 2014) (quotations and citations omitted). However, a surreply is not generally permitted where the reply is responsive to an issue raised in the opposition.  *See Khoury v. Meserve*, 268 F. Supp. 2d 600, 605-06 (D. Md. 2003).

The arguments in the motions could have been raised in plaintiff's Opposition. Therefore, plaintiff's uninvited briefing following the government's reply was unnecessary.

Plaintiff made no effort to comply with Local Rule 105.2(a). *See* ECF 32 ("I do not move for permission to do a sur-reply, but I cannot allow counsel for the State Department to mislead this Court."). Accordingly, I shall deny ECF 33, ECF 36, ECF 37, and ECF 38 as improper surreplies.

### III.   The Government Motion

#### A.  Standards of Review

##### 1.  Fed. R. Civ. P. 12(b)(1)

Under Fed. R. Civ. P. 12(b)(1), the plaintiff bears the burden of proving, by a preponderance of evidence, the existence of subject matter jurisdiction. *See Demetres v. E. W. Const., Inc*., 776 F.3d 271, 272 (4th Cir. 2015); s*ee also The Piney Run Preservation Ass'n v. Cty. Comm'rs of Carroll Cty*., 523 F.3d 453, 459 (4th Cir. 2008); *Evans v. B.F. Perkins Co*., 166 F.3d 642, 647 (4th Cir. 1999). A challenge to subject matter jurisdiction under Rule 12(b)(1) may proceed "in one of two ways": either a facial challenge or a factual challenge. *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (citation omitted); *accord Hutton v. Nat'l Bd. of Examiners Inc.*, 892 F.3d 613, 620-21 (4th Cir. 2018); *Durden v. United States*, 736 F.3d 296, 300 (4th Cir. 2013).

In a facial challenge, "the defendant must show that a complaint fails to allege facts upon which subject-matter jurisdiction can be predicated." *Hutton*, 892 F.3d at 621 n.7 (citing *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017)); *see also Kerns*, 585 F.3d at 192. Alternatively, in a factual challenge, "the defendant maintains that the jurisdictional allegations of the complaint are not true." *Hutton*, 892 F.3d at 621 n.7 (citing *Beck*, 848 F.3d at 270). In that

circumstance, the court "may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004); *see also Beck*, 848 F.3d at 270; *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 333 (4th Cir. 2014); *Evans*, 166 F.3d at 647.

The government raises a facial challenge to the Court's subject matter jurisdiction, asserting that the doctrine of sovereign immunity forecloses plaintiffs' claims for monetary damages. ECF 24-1 at 12-13. As indicated, this challenge is based on the four corners of the Complaint.

The Fourth Circuit has said that the defense of sovereign immunity is a jurisdictional bar, stating that "'sovereign immunity deprives federal courts of jurisdiction to hear claims, and a court finding that a party is entitled to sovereign immunity must dismiss the action for lack of subject-matter jurisdiction.'" *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 649 (4th Cir. 2018) (citation omitted), *cert. denied*, ___ U.S. ___, 139 S. Ct. 417 (2018). But, a defendant "bears the burden of demonstrating" sovereign immunity, because it is "akin to an affirmative defense." *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 543 (4th Cir. 2014).

### 2. Fed. R. Civ. P. 56

As noted, the Government Motion is styled as a "Motion to Dismiss Plaintiff's Complaint, Or, In The Alternative For Summary Judgment." ECF 24. Such a motion implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450

(4th Cir. 2007).  However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d).  If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).  But, when the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).[5]

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it."  5 C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366 (3d ed. 2018). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id*.  In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary.  *Id.*

Summary judgment ordinarily is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours and Co. v. Kolon Indus., Inc.*,

---

[5] In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials.").

637 F.3d 435, 448-49 (4th Cir. 2011); *see Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015).   As the Fourth Circuit has said, when a district judge rules on a summary judgment motion prior to discovery, it is akin to "for[cing] the non-moving party into a fencing match without a sword or mask."   *McCray v. Md. Dep't of Transp.*, 741 F.3d 480, 483 (4th Cir. 2014); *accord Putney v. Likin*, 656 F. App'x 632, 639 (4th Cir. 2016) (per curiam).

However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'"   *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)).   To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

"To justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'"   *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted), *rev'd on other grounds sub nom. Gardner v. Ally Fin., Inc.*, 514 F. App'x 378 (4th Cir. 2013) (per curiam).   A nonmoving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see McClure v. Ports*, 914 F.3d 866, 874 (4th Cir. 2019); *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014); *Amirmokri v. Abraham*,

14

437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x 274 (4th Cir. 2008) (per curiam), *cert. denied*, 555 U.S. 885 (2008).

If a nonmoving party believes that further discovery is necessary before consideration of summary judgment, the party who fails to file a Rule 56(d) affidavit does so at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods,* 302 F.3d at 244 (citations omitted). But, the non-moving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature.

Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id.* (internal citations omitted). According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Id.* at 244-45 (internal citations omitted).

Plaintiff, who is a lawyer, has not filed a Rule 56(d) Affidavit. Nor does he oppose assessing the Government Motion under Rule 56. To the contrary, Mr. Straw moved for summary judgment before the government, arguing that "summary judgment is appropriate" because the facts are "indisputable." ECF 20 at 1. And, in his Opposition to the Government Motion, he does not contend that discovery is warranted. ECF 25. Moreover, plaintiff has inundated the Court with affidavits and "Notice[s]" in support of his claims and in opposing the

government's contentions.  *See* ECF 25-1 to ECF 25-6; ECF 26; ECF 32; ECF 33; ECF 37; ECF 38; ECF 42; ECF 43; ECF 44; ECF 45.   Therefore, I shall consider the Government Motion under Fed. R. Civ. P. 56.

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Variety Stores, Inc. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Iraq Middle Mkt. Dev. Found v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017).  To avoid summary judgment, the nonmoving party must demonstrate that there is a genuine dispute of material fact so as to preclude the award of summary judgment as a matter of law.  *Ricci v. DeStefano*, 557 U.S. 557, 585-86 (2009); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Gordon v. CIGNA Corp.*, 890 F.3d 463, 470 (4th Cir. 2018).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion.  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Id.* at 248.

There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*; *see Variety Stores, Inc.*, 888 F.3d at 659; *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).

On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. But, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see also Celotex*, 477 U.S. at 322-24. And, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *Ricci*, 557 U.S. at 585-86; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *accord Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Variety Stores, Inc.*, 888 F.3d at 659; *Gordon*, 890 F.3d at 470; *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Wilson v. Prince George's Cty.*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness

credibility.  *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002).

When, as here, the parties have filed cross-motions for summary judgment, the court "'consider[s] each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law.'"  *Def. of Wildlife v. N.C. Dep't of Transp*., 762 F.3d 374, 392 (4th Cir. 2014) (citation omitted).  In doing so, the court "'resolve[s] all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion.'"  *Id.* at 393 (quoting *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003), *cert. denied*, 540 U.S. 822 (2003)); *see Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).

Simply because both parties have filed for summary judgment does not mean that summary judgment to one party or another is necessarily appropriate.  Rather, "[b]oth motions must be denied if the court finds that there is a genuine issue of material fact."  10A WRIGHT, MILLER & KANE, FEDERAL PRACTICE & PROCEDURE § 2720 (4th ed. 2019).

## B.  Sovereign Immunity

### 1.  Sovereign Immunity generally

The government argues that to the extent plaintiff seeks money damages, his claims are foreclosed by sovereign immunity.  ECF 24-1 at 11-13.

As a general rule, the United States and its agencies are immune from suit.  *See FDIC v. Meyer*, 510 U.S. 471, 475 (1994); *Dalehite v. United States*, 346 U.S. 15, 30 (1953); *Robinson v. U.S. Dep't of Educ.*, 917 F.3d 799, 801 (4th Cir. 2019); *Bullock v. Napolitano*, 666 F.3d 281, 284 (4th Cir. 2012).  This is so because a sovereign "is immune from suit save as it consents to be sued."  *United States v. Sherwood*, 312 U.S. 584, 586 (1941) (citations omitted); *see United*

*States v. Mitchell*, 463 U.S. 206, 212 (1983) (observing that it is "axiomatic that the United States may not be sued without its consent").

Sovereign immunity is no ordinary defense.  Rather, it deprives the court of subject matter jurisdiction.  *See Mitchell*, 463 U.S. at 212 (recognizing that the sovereign's consent is "a prerequisite for jurisdiction"); *see also Meyer*, 510 U.S. at 475; *Sherwood*, 312 U.S. at 586; *Bullock*, 666 F.3d at 284.  Thus, a court has no authority over the United States unless Congress waives the federal government's sovereign immunity.  *See Meyer*, 510 U.S. at 475; *Robinson*, 917 F.3d at 801.

As a federal agency, the State Department enjoys "a presumption of immunity from the present lawsuit."  *Robinson*, 917 F.3d at 801.  And, Mr. Straw, as the plaintiff, has the "burden to show that an unequivocal waiver of sovereign immunity exists and that none of the statute's waiver exceptions apply to his particular claim."  *United States v. Welch*, 409 F.3d 646, 651 (4th Cir. 2005); *see Robinson*, 917 F.3d at 801; *Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995).

A "waiver of sovereign immunity must be unequivocally expressed in statutory text," and the waiver must be "clearly evident from the language of the statute."  *FAA v. Cooper*, 566 U.S. 284, 290 (2012) (internal quotation marks omitted); *see Lane v. Pena*, 518 U.S. 187, 192 (1996) (observing that a waiver of sovereign immunity "must be unequivocally expressed in statutory text, and will not be implied"); *United States v. King*, 395 U.S. 1, 4 (1969) (same).  In other words, a waiver of sovereign immunity "cannot contain an ambiguity, which 'exists if there is a plausible interpretation of the statute that would not authorize money damages against the Government.'"  *Robinson*, 917 F.3d at 802 (quoting *Cooper*, 566 U.S. 290-91).  Moreover, "[a]ll waivers of sovereign immunity must be 'strictly construed in favor of the sovereign.'"

*Williams*, 50 F.3d at 650 (ellipses omitted) (quoting *Lane*, 518 U.S. at 192). Simply put, sovereign immunity "can only be waived by statutory text that is unambiguous and unequivocal." *Robinson*, 917 F.3d at 802.

As the Fourth Circuit has observed, "[a] strong doctrine of sovereign immunity is nowhere more important than for damages claims." *Robinson*, 917 F.3d at 801. Indeed, "[m]oney judgments against a sovereign allow 'the judgment creditor' to compete with 'other important needs and worthwhile ends for access to the public fisc.'" *Id.* (ellipses omitted) (quoting *Alden v. Maine*, 527 U.S. 706, 751 (1999)).

2.   Analysis

Applying the principles of sovereign immunity to this case, this Court is without jurisdiction to consider plaintiff's claims for damages. I address each claim, in turn.

In Count I, plaintiff seeks $52,000 for violations of his right to substantive due process, pursuant to *Bivens*, 403 U.S. 388. ECF 1, ¶¶ 16-17. Under *Bivens*, a federal official may be held personally liable for damages if the official personally violated the plaintiff's constitutional rights. *See generally Hernandez v. Mesa*, ___ U.S. ___, 140 S. Ct. 735 (2020) (discussing the scope of *Bivens* remedies); *Tun-Cos v. Perrotte*, 922 F.3d 514, 520 (4th Cir. 2019).

In the wake of *Bivens*, the Supreme Court has been reluctant to imply other private actions against federal officers for money damages, recognizing a *Bivens* remedy in just two cases. In *Davis v. Passman*, 442 U.S. 228, 248-49 (1979), the Court recognized that the equal protection component of the Fifth Amendment's Due Process Clause provided a damages remedy for an assistant who alleged that a Congressman fired her because she was a woman. And, in *Carlson v. Green*, 446 U.S. 14, 19 (1980), the Court held that the Eighth Amendment's

Cruel and Unusual Punishments Clause provided a damages remedy for the estate of a prisoner who died due to the alleged failure of federal jailers to provide adequate medical care.

However, since *Carlson*, the Court has repeatedly refused to extend the *Bivens* doctrine to new factual scenarios. *See Tun-Cos*, 922 F.3d at 521 (cataloguing the nine Supreme Court cases rejecting *Bivens* claims). And, the Court has admonished that expanding *Bivens* is a "'disfavored' judicial activity" that should not be undertaken lightly. *Ziglar v. Abbasi*, ___ U.S. ___, 137 S. Ct. 1843, 1857 (2017) (citation omitted).

Of import here, *Bivens* liability does not run against a federal agency. In *FDIC v. Meyer*, 510 U.S. 471 (1994), the Supreme Court considered whether a *Bivens* action could be brought directly against a federal agency, as opposed to the federal agents in their individual capacities. *Id.* at 473-44. The Court unanimously declined to extend *Bivens* to agencies, reasoning that if it "impl[ied] a damages action against federal agencies . . . there would be no reason . . . to bring damages actions against individual officers [and] . . . the deterrent effects of the *Bivens* remedy would be lost." *Id.* at 485. Thus, following *Meyers* it is axiomatic that "[a]ny remedy under *Bivens* is against federal officials individually, not the federal government." *Randall v. United States*, 95 F.3d 339, 345 (4th Cir. 1996); *see also Doe v. Chao*, 306 F.3d 170, 184 (4th Cir. 2002).

Here, plaintiff has only sued the State Department, a federal agency. Therefore, the Court is without jurisdiction to entertain plaintiff's *Bivens* claim.

In Count II, plaintiff seeks $1,000,000 on the ground that the State Department violated the ECOA and the Rehabilitation Act. ECF 1, ¶¶ 19-22. Neither statute, however, contains an unambiguous waiver of the government's sovereign immunity applicable to Mr. Straw.

The ECOA provides a cause of action for discrimination in credit transactions. Specifically, ECOA makes it "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction" either "on the basis of race, color, religion, national origin, sex or marital status, or age" or "because all or part of the applicant's income derives from any public assistance program." 15 U.S.C. § 1691(a)(1). Notably, because ECOA defines a "creditor" to include the United States government, *see id.* §§ 1691a(e), (f), it waives the sovereign immunity of the United States for claims brought under the ECOA. *See Moore v. U.S. Dep't of Agric*, 55 F.3d 991, 994-95 (5th Cir.1995); *Benoit v. U.S. Dep't of Agric.*, 577 F. Supp. 2d 12, 17 (D.D.C. 2008); *Williams v. Conner*, 522 F. Supp. 2d 92, 99 (D.D.C. 2007).

Mr. Straw asserts that the State Department is liable under ECOA because it engaged in "discrimination based on disability in lending and the repatriation loan is a lending program." ECF 1, ¶ 21; *see also* ECF 25 at 17 (arguing that "[i]nstead of respecting my disabilities, the State Department . . . den[ied] me credit while completely disregarding my disabilities and rejecting my accommodations for them"). ECOA does not, however, proscribe lending discrimination on the basis of disability. *See, e.g.*, *Thiel v. Veneman*, 859 F. Supp. 2d 1182, 1188 (D. Mont. 2012) (dismissing ECOA claim predicated on disability for failure to state a claim).

Perhaps ECOA should cover disability. But, courts "do not sit as councils of revision, empowered to rewrite legislation in accord with their own conceptions of prudent public policy." *United States v. Rutherford*, 442 U.S. 544, 555 (1979). It follows that because the text of ECOA is silent as to disability discrimination, it does not unambiguously waive the government's sovereign immunity with respect to Mr. Straw's claim.

Finally, plaintiff seeks to recover damages under Section 504 of the Rehabilitation Act, which provides: "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a); *see* ECF 1, ¶ 19. Defendant asserts that plaintiff's claim is barred by sovereign immunity because the Rehabilitation Act waives the government's sovereign immunity only for discrimination that occurs "in the United States," and Mr. Straw resides in the Philippines. ECF 24-1 at 12-13. Additionally, the government argues that the Rehabilitation Act does not waive the federal government's sovereign immunity against monetary damages. *Id.* at 13 (citing *Lane*, 518 U.S. 187).

Two principles guide the Court's analysis. First, as noted, the doctrine of sovereign immunity shields the government from liability except when waived by statute, and any such waiver "must be 'strictly construed in favor of the sovereign.'" *Welch*, 409 F.3d at 650 (ellipses omitted) (quoting *Lane*, 518 U.S. at 192). Second, "[i]t is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010); *see also Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 115 (2013); *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991). The presumption against extraterritoriality "rests on the perception that Congress ordinarily legislates with respect to domestic, not foreign matters." *Morrison*, 561 U.S. at 255. Thus, a statute is presumed to stop at the borders of the United States, absent clear congressional intent of extraterritoriality. *See id.*; *see also RJR Nabisco, Inc. v. European Cmty.*, ___ U.S. ___, 136 S. Ct. 2090, 2102 (2016) (explaining that "the presumption can be overcome only by a clear indication of extraterritorial

effect," although "an express statement of extraterritoriality is not essential"); *Kiobel*, 569 U.S. at 118; *Reyes-Gaona v. N.C. Growers Assoc.*, 250 F.3d 861, 864 (4th Cir. 2001) ("The presumption against extraterritoriality 'can be overcome only if there is an 'affirmative intention of the Congress clearly expressed.'") (quoting *Aramco*, 499 U.S. at 248). Stated otherwise, "[w]hen a statute gives no clear indication of an extraterritorial application, it has none." *Morrison*, 561 U.S. at 255.

The Rehabilitation Act evinces no congressional intent to extend protection to individuals located outside the jurisdiction of the United States. To the contrary, the statute expressly limits its scope to "individual[s] with a disability in the United Sates." 29 U.S.C. § 794(a). Thus, by its own terms, the Rehabilitation Act supports rather than rebuts the presumption against extraterritoriality. This language, read in light of the canon that waivers of sovereign immunity are construed in favor of the government, makes clear that the Rehabilitation Act does not protect individuals located abroad. *See Awodiya v. Ross Univ. Sch. of Med.*, 391 F. Supp. 3d 1098, 1104 (S.D. Fla. 2019) (concluding that the Rehabilitation Act does not rebut the presumption against extraterritoriality), *appeal docketed* No. 19-12832 (11th Cir. July 18, 2019); *Galligan v. Adtalem Glob. Educ. Inc.*, No. 17 C 6310, 2019 WL 423356, at *3 (N.D. Ill. Feb. 4, 2019) (same); *Archut v. Ross Univ. Sch. of Veterinary Med.*, No. CIV.A. 10-1681 MLC, 2012 WL 5867148, at *11 (D.N.J. Nov. 19, 2012) (same), *aff'd*, 580 F. App'x 90 (3d Cir. 2014).

Plaintiff resists the conclusion that the Rehabilitation Act applies only domestically, relying on a 2013 report by the National Council on Disability. *See* ECF 25, ¶ 41 (citing NAT'L COUNCIL ON DISABILITY, TOWARD THE FULL INCLUSION OF PEOPLE WITH DISABILITIES: EXAMINING THE ACCESSIBILITY OF OVERSEAS FACILITIES AND PROGRAMS FUNDED BY THE

UNITED STATES 44 (March 20, 2013) www.ncd.gov/publications/2013/032013).  The report suggests that Section 504 the Rehabilitation Act applies to Americans abroad on the basis of a pair of cases, *Bird v. Lewis & Clark Coll.*, 104 F. Supp. 2d 1271 (D. Or. 2000), *aff'd*, 303 F.3d 1015 (9th Cir. 2002) and *King v. Bd. of Control of E. Mich. Univ.*, 221 F. Supp.2d 783 (E.D. Mich. 2002).   However, neither decision is persuasive.   Notably, other courts faced with deciding whether the Rehabilitation Act applies abroad have rejected the reasoning and result of *Bird* and *King*.  *See Archut*, 2012 WL 5867148, at *6-7.

In *Bird*, 104 F. Supp. 2d at 1274, the district court found that the plaintiff could bring claims under the Rehabilitation Act and the Americans with Disabilities Act ("ADA") against an American college for alleged discrimination that occurred while the plaintiff studied abroad. But, the court failed to assess the statutes separately, even though the ADA does not include the "in the United States" language, unlike the Rehabilitation Act.  *See id.* at 1274-76.  Because the Ninth Circuit resolved the case on other grounds, it declined to address the college's argument that the Rehabilitation Act did not apply extraterritorially.  *Bird*, 303 F.3d 1015 n.1.

The case of *King*, 221 F. Supp. 2d 783, is similarly unhelpful.  It concerned a different federal statute (Title IX), involved starkly different facts than those present here (discrimination suffered by a student while studying abroad on a program maintained by an American university), and predates *Morrison*, 561 U.S. 247, in which the Supreme Court recast the test for whether a statute has extraterritorial reach from a freewheeling purpose-mining inquiry to one principally focuses on statutory text.

As indicated, the Rehabilitation Act does not apply abroad.  Therefore, the Court must "determine whether this case involves a domestic application of the statute," which entails "looking to the statute's 'focus.'"  *RJR Nabisco*, 136 S. Ct. at 2101.  "If the conduct relevant to

the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad." *Id.*  On the other hand, "if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." *Id.*; *see also Roe v. Howard*, 917 F.3d 229, 240 (4th Cir. 2019) (discussing the two-step framework explicated in *RJR Nabisco*).

There is no genuine issue of material fact that the alleged discrimination that forms the basis of plaintiff's Complaint occurred in the Philippines, where both Mr. Straw and Ms. Tabbada were located at the relevant time.  Mr. Straw applied for a repatriation loan through the U.S. embassy in the Philippines and he communicated with ACS staff located in the Philippines.  Indeed, plaintiff's theory of this case is that the State Department has prevented his repatriation to the United States.  Accordingly, because the Rehabilitation Act does not apply extraterritorially, and the alleged discrimination occurred in the Philippines, the Rehabilitation Act does not waive the government's sovereign immunity as to plaintiff's claim.

In sum, plaintiff's claims for monetary damages are foreclosed by sovereign immunity. Thus, the government is entitled to summary judgment on plaintiff's claims brought under *Bivens*, ECOA, and the Rehabilitation Act.

## C.  Plaintiff's Request for Injunctive Relief

In his Complaint, Mr. Straw seeks an injunction requiring the State Department to issue Ms. Tabbada a B1 nonimmigrant visa.  ECF 1, ¶ 29.  In response, the government argues that such relief is foreclosed by the doctrine of consular nonreviewability.  ECF 24-1 at 13-18.

Policies concerning the admissibility of aliens are "vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the

26

maintenance of a republican form of government." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952). Because these powers are "exclusively entrusted to the political branches of government," *id.* at 589, the admission and exclusion of foreign nationals is "'largely immune from judicial control.'" *Trump v. Hawaii*, ___ U.S. ___, 138 S. Ct. 2392, 2418 (2018) (citation omitted). Thus, it is "not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a given alien." *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950); *see Hawaii*, 138 S. Ct. at 2418-19; *Lem Moon Sing v. United States*, 158 U.S. 538, 547 (1895) ("The power of Congress to exclude aliens altogether from the United States, or to prescribe the terms and conditions upon which they may come to this country, and to have its declared policy in that regard enforced exclusively through executive officers, without judicial intervention, is settled by our previous adjudications.").

To my knowledge, the Fourth Circuit has not yet recognized the "doctrine of consular nonreviewability." But, other circuits, as well as district courts within the Fourth Circuit, have recognized that courts cannot second guess a consular officer's decision to grant or deny a visa application. *See City & Cty. of San Francisco v. U.S. Citizenship & Immigration Servs.*, 944 F.3d 773, 791 (9th Cir. 2019); *Yafai v. Pompeo*, 912 F.3d 1018, 1020-21 (7th Cir. 2017); *Onuchukwu v. Clinton*, 408 F. App'x 558, 560 (3d Cir. 2010) (per curiam); *Am. Acad. of Religion v. Napolitano*, 573 F.3d 115, 123 (2d Cir. 2009); *Saavedra Bruno v. Albright,* 197 F.3d 1153, 1159 (D.C. Cir. 1999); *see also Abebe v. Perez*, No. 3:14-cv-4415, 2016 WL 454897, at *1-2 (D.S.C. Feb. 5, 2016); *Macena v. U.S. Citizenship & Immigration Servs.*, TDC-14-3464, 2015 WL 6738923, at *4 (D. Md. Nov. 2, 2015); *Adeyemo v. Kerry*, DKC-12-0874, 2013 WL 498169, at *2 (D. Md. Feb. 7, 2013), *aff'd*, 546 F. App'x 187 (4th Cir. 2013); *Rodriguez Ramirez*

*v. Clinton*, No. 5:12-cv-00252-BR, 2013 WL 227732 (E.D.N.C. Jan. 22, 2013), *aff'd*, 537 F. App'x 209 (4th Cir. 2013); *Romero v. Consulate of U.S., Barranquilla, Colombia*, 860 F. Supp. 319, 322 (E.D. Va. 1994).

The doctrine of consular nonreviewability of visa determinations "is essentially without exception." *Romero*, 860 F. Supp. at 322. Were it otherwise, "federal courts would be inundated with claims of disappointed and disgruntled off-shore aliens seeking review of consular officers' denials of their requests for nonimmigrant visitor's visas." *Id.* at 324. That said, the Supreme Court recognized a limited exception to the consular nonreviewability doctrine in *Kleindienst v. Mandel*, 408 U.S. 753 (1972). There, the Court held that the denial of a visa is subject to review where the denial implicates the constitutional rights of a United States citizen. *See id.* at 765-90; *see also Hawaii*, 138 S. Ct. at 2419.

However, even when *Mandel* applies, the court's role in reviewing a visa determination is exceedingly narrow. The court asks only if the consular officer's decision to deny the visa was made "on the basis of a facially legitimate and bona fide reason." *Id.* at 769. That is, "'the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification' against the asserted constitutional interests of U.S. citizens." *Hawaii*, 138 S. Ct. at 2419 (quoting *Mandel*, 408 U.S. at 770).

In his Complaint, plaintiff contests the denial of Ms. Tabbada's visa, asserting: "There was no reason to reject her application because she had all police clearances spotless and she would be paid by Medicare once we reach U.S. soil. Her four children live in the Philippines, all minors, and so she has reason to return also." ECF 1, ¶ 29. But, this is exactly the type of consular decision that is "not within the province" of this Court to review. *Shaughnessy*, 338 U.S. at 539-40, 543 (upholding the Attorney General's decision to deny a visa to a U.S. citizen's

foreign national wife without a hearing and solely because "her admission would be prejudicial to the interests of the United States").

In his Opposition, Mr. Straw appears to change course, asserting that the denial of Ms. Tabbada's visa violated his "constitutional right to travel, to not experience due process violations, and to travel free of official discrimination by the State Department itself." ECF 25, ¶ 53; *see id.* ¶¶ 42-43 (citing *Kent v. Dulles*, 357 U.S. 116 (1958)). Further, it appears that plaintiff contends that the denial of Ms. Tabbada's visa impinges on his right to marriage. *Id.* ¶ 60. But, none of the rights that the plaintiff invokes allow this Court to review the State Department's rejection of Ms. Tabbada's visa application.

Plaintiff has not put forth any facts to show that the denial of Ms. Tabbada's visa implicates his ability to travel. To be sure, the Supreme Court has recognized a fundamental right to interstate travel. *See Attorney General of New York v. Soto-Lopez*, 476 U.S. 898, 903 (1986) (Brennan, J., plurality opinion); *Kent*, 357 U.S. at 126; *Willis v. Town of Marshall*, 426 F.3d 251, 264 (4th Cir. 2005). The denial of Ms. Tabbada's visa does not implicate that right, however. Under the FAM's provisions, if the State Department deems that Mr. Straw requires an escort, his repatriation loan may cover the expenses associated with the escort. 7 FAM § 371(i)(6). In that case, Mr. Straw, as the signatory of the loan, has the "right to concur in the selection of the escort . . . ." *Id.* § 374.4(c). The only restriction on Mr. Straw's ability to choose an escort is that the escort "must" either be a United States citizen, have a visa, or be visa-eligible. *Id.* § 374.4(b). And, the State Department can find a suitable escort on Mr. Straw's behalf if he cannot locate someone who meets State Department criteria. See ECF 24-2, ¶ 19.

Therefore, it is Mr. Straw's insistence that Ms. Tabbada serve as his escort, not the State Department's policies, that is inhibiting his ability to travel. *See e.g.*, *Gilmore v. Gonzales*, 435

F.3d 1125, 1137 (9th Cir. 2006) (requiring a person to comply with identification policy before flying commercially does not violate the person's right to travel). Accordingly, plaintiff's invocation of his right to travel does not trigger *Mandel*'s narrow exception to the doctrine of consular nonreviewability.

Nor does Mr. Straw's desire to marry Ms. Tabbada give rise to a constitutional claim that brings this case within the ambit of *Mandel*. In *Kerry v. Din*, ___ U.S. ___, 135 S. Ct. 2128 (2015), the Ninth Circuit ruled that a U.S. citizen who challenged the denial of an immigrant visa to her foreign husband had a constitutionally protected liberty interest in living in the United States with her spouse. A fractured Supreme Court reversed. A plurality of the Court (Chief Justice Roberts and Justices Scalia and Thomas) concluded that a citizen whose spouse is denied a visa is not injured under the Due Process Clause. *Id.* at 2131. In their view, the citizen lacked a due process claim because she "was not deprived of 'life, liberty, or property' when the Government denied [her spouse] admission to the United States." *Id.* at 2138. Justices Kennedy and Alito concurred in the judgment but found it unnecessary to decide whether the U.S. spouse has a liberty or property interest because the visa denial satisfied *Mandel*'s "facially legitimate and bona fide" standard. *Id.* at 2139-40 (Kennedy, J., concurring). In contrast, Justices Ginsburg, Breyer, Sotomayor, and Kagan dissented on the ground that due process "encompasses the right of spouses to live together and to raise a family." *Id.* at 2142 (Breyer, J., dissenting).

Lower courts are in accord that Justice Kennedy's concurrence, as the narrowest ruling, is the controlling opinion. *See Morfin v. Tillerson*, 851 F.3d 710, 713 (7th Cir. 2017); *Cardenas v. United States*, 826 F.3d 1164, 1171 (9th Cir. 2016). However, the *Din* Court's refusal to recognize a constitutional right to an alien spouse's presence in the United States compels the

conclusion that a citizen has no due process right to the presence of an alien whom he wishes to marry.[6]  *See Chiang v. Skeirik*, 582 F.3d 238, 242 (1st Cir. 2009) (observing that "[t]here is no authority supporting the view that a United States citizen has a constitutional right to engage in a marriage ceremony in the United States at which the foreign national is present"); *Mayle v. Holder*, No. 14-cv-04072-JSC, 2015 WL 4193864, at *3 (N.D. Cal. July 10, 2015) (distinguishing between spouse and fiancé); *Macena*, 2015 WL 6738923, at *4 (finding that the citizen plaintiff had not stated a plausible constitutional right to review a visa denial arising from alien's status as fiancé).  Indeed, lower courts have found that there is no due process right to reside in the United States with alien family members, including spouses, parents, and children. *See, e.g.*, *Rohrbaugh v. Pompeo*, 394 F. Supp. 3d 128 (D.D.C. 2019) (collecting cases holding that a U.S. citizen has no constitutional right to spouse's presence); *Singh v. Tillerson*, 271 F. Supp. 3d 64, 72 (D.D.C. 2017) (plaintiff had no constitutionally protected liberty interest in the parent-child relationship); *see also* ECF 24-1 (collecting cases).

Thus, because plaintiff has not established that the denial of Ms. Tabbada's visa burdened his constitutional rights, the doctrine of consular nonreviewability bars this Court from assessing whether the State Department had a legitimate basis to deny Ms. Tabbada a visa.  Accordingly, I shall deny plaintiff's request for injunctive relief.

### D.  Plaintiff's Request for Declaratory Relief

As noted, plaintiff asks the Court to declare that "when a disabled person with conclusive evidence of severe disabilities asks for an accommodation, the United States may not say no to that request in the context of the Rehabilitation Loan program," ECF 1, ¶ 25, and that "only [a]

---

[6] Notably, the denial of Ms. Tabbada's visa does not infringe plaintiff right to marry because they can marry in a third country or in the United States by proxy. *See* 9 FAM § 102.8 (Feb. 15, 2018) (discussing proxy marriages).

disabled person/applicant can decide what accommodation they need and no medical certificate *simply showing fitness to travel* can be used to deny any accommodation, including for an escort." *Id.* ¶ 26 (emphasis in original). Further, Mr. Straw seeks a judgment that "denying a severely disabled person an escort" is "discrimination on its face." *Id.* ¶ 27.

The Declaratory Judgment Act "is remedial only and neither extends federal courts' jurisdiction nor creates any substantive rights." *CGM, LLC v. BellSouth Telcoms., Inc.*, 664 F.3d 46, 55 (4th Cir. 2011) (citing S*kelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671-72 (1950)). In other words, a plaintiff's claim for declaratory relief is concomitant to and coterminous with his substantive claims. Consequently, "'[a] request for declaratory relief is barred to the same extent that the claim for substantive relief on which it is based would be barred.'" *CGM, LLC*, 664 F.3d at 55-56 (alteration in original) (citation omitted).

As I have explained, Mr. Straw's substantive claims are barred by sovereign immunity and consular nonreviewability. Therefore, plaintiff's claims under the Declaratory Judgment Act warrant dismissal.

## IV.    The Motion to Amend

In ECF 17, titled "Motion For Permission To Include Judiciary Act of 1925 Declaration In Amended Complaint," plaintiff seeks leave to amend his Complaint to mount a constitutional challenge to the Judiciary Act of 1925, which gave rise to the Supreme Court's discretionary certiorari process, now codified at 28 U.S.C. § 1254(1). *See* ECF 17, ¶ 7. Plaintiff complains that he has petitioned the Supreme Court multiple times to no avail, and that he "expect[s] this State Department case to rise to the certiorari stage." *Id.* ¶¶ 4-5. According to plaintiff, "[e]very citizen who brings litigation to the U.S. courts has a right to U.S. Supreme Court review" and

therefore the Court's certiorari process violates litigants' "Fifth Amendment Due Process and First Amendment access to Courts." *Id.* ¶ 7.

Rule 15 of the Federal Rules of Civil Procedure governs amendments to pleadings. It provides that a party "may amend [his] pleading once as a matter of course" before the opposing party files a responsive pleading. Fed. R. Civ. P. 15(a)(1). Thereafter, "a party may amend its pleading only with the opposing party's written consent or the court's leave." However, Rule 15 provides that leave to amend should be "freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a)(2); *see Foman v. Davis*, 371 U.S. 178, 182 (1962); *Save Our Sound OBX, Inc. v. N.C. Dep't of Transp.*, 914 F.3d 213, 227-28 (4th Cir. 2019); *Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 409 (4th Cir. 2013). This injunction "gives effect to the federal policy in favor of resolving cases on their merits instead of disposing of them on technicalities." *Matrix Capital Mgmt. Fund LP v. Bearing Point, Inc.*, 576 F.3d 172, 193 (4th Cir. 2009).

Nonetheless, a court should deny leave to amend in three circumstances: "'when the amendment would be prejudicial to the opposing party, the moving party has acted in bad faith, or the amendment would be futile.'" *Davison v. Randall*, 912 F.3d 666, 690 (4th Cir. 2019) (quoting *Equal Rights Ctr. v. Niles Bolton Assocs.*, 602 F.3d 597, 603 (4th Cir. 2010)); *see Scott v. Family Dollar Stores, Inc.*, 733 F.3d 105, 121 (4th Cir. 2013).

Of relevance here, leave to amend should be denied when the proposed amendment would be futile. *See Foman*, 371 U.S. at 182; *see also Save Our Sound OBX*, 914 F.3d at 228; *Laber*, 438 F.3d at 426. "A proposed amendment is futile when it is 'clearly insufficient or frivolous on its face.'" *Save Our Sound OBX*, 914 F.3d at 228 (citation omitted). A proposed amendment is also futile if the complaint, as amended, fails to state a claim upon which relief could be granted. *Save Our Sound OBX*, 914 F.3d at 228. Thus, a court may disallow

amendment where "the new claim would not have survived a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)." *Davison*, 912 F.3d at 690; *see also Martin v. Duffy*, 858 F.3d 239, 247-48 (4th Cir. 2017) (affirming denial of leave to amend on futility grounds where the plaintiff's "pleading deficiency cannot be cured by amendment of his complaint"), *cert. denied*, ___ U.S. ___ 138 S. Ct. 738 (2018); *U.S. Airline Pilots Ass'n v. Awappa, LLC*, 615 F. 3d 312, 320 (4th Cir. 2010) (stating that a court need not grant leave to amend where the amendment would have "no impact on the outcome of the motion to dismiss").

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 687-80 (2009) (expounding on the Rule 12(b)(6) standard); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). To be sure, a plaintiff need not include "detailed factual allegations" to withstand a motion to dismiss. *Twombly*, 550 U.S. at 555. But, it is axiomatic that "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" are insufficient. *Twombly*, 550 U.S. at 570; *see Iqbal*, 556 U.S. at 678 (explaining that "an unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim). In short, to survive Rule 12(b)(6), the "'plaintiffs' factual allegations must be enough to raise a right to relief above the speculative level, thereby nudging their claims across the line from conceivable to plausible.'" *Hately v. Watts*, 917 F.3d 770, 781 (4th Cir. 2019) (citation omitted).

Notably, a district court has "broad discretion to deny leave to amend, 'so long as it does not outright refuse to grant the leave without any justifying reason.'" *Edwards v. Genex Coop., Inc.*, 777 F. App'x 613, 622 (4th Cir. 2019) (quoting *Equal Rights Ctr.*, 602 F.3d at 603). A

court abuses its discretion to grant or deny leave to amend "'by resting its decision on a clearly erroneous finding of a material fact, or by misapprehending the law with respect to underlying issues in litigation.'" *Edwards*, 777 F. App'x at 622 (quoting *Scott*, 733 F.3d at 112).

Allowing plaintiff to amend his Complaint to contest the validity of the Supreme Court's certiorari process would be an exercise in futility.  Also referred to as the "Judge's Bill," Congress passed the Judiciary Act of 1925 to reduce the workload of the Supreme Court by eliminating mandatory appeals and giving the Court control over its docket.  *See* Judiciary Act of 1925, Pub. L. No. 68-415, 43 Stat. 936 (1925); *see* Cass R. Sunstein, *Unanimity and Disagreement on The Supreme Court*, 100 CORNELL L. REV. 769, 794-96 (2015).  In so doing, the Judiciary Act gave rise to "the modern Supreme Court."  Edward A. Hartnett, *Questioning Certiorari: Some Reflections Seventy-Five Years After the Judges' Bill*, 100 COLUM. L. REV. 1643, 1646 (2000).  Indeed, the Act achieved its intended effect: "Between the 1926 and 1928 Terms the number of plenary decisions fell by more than one-third, and it has never returned to the levels seen prior to the Act."  Margaret Meriwether & Cordraya1 Richard Cordray, *The Philosophy of Certiorari: Jurisprudential Considerations in Supreme court Case Selection*, 82 WASH. U. L. Q. 389, 393 (Summer 2004).

Today, the Court's certiorari process is enshrined in 28 U.S.C. § 1254.  In particular, § 1254(1) provides: "Cases in the courts of appeals *may be reviewed* by the Supreme Court by . . . writ of certiorari granted upon the petition of any party to any civil or criminal case, before or after rendition of judgment or decree." (Emphasis added).

Plaintiff's due process attack on the certiorari system is without merit.  As one commentator has noted, "due process does not require any level of appellate review much less a right to Supreme Court review."  Julian Velasco, *Congressional Control Over Federal Court*

*Jurisdiction: A Defense of the Traditional View*, 46 CATH. UNIV. L. REV. 671, 692-93 (1997).  In

*McKane v. Durston*, 153 U.S. 684 (1894), the Court held that the due process clause does not

require states to provide appellate review of criminal convictions, observing instead that "[i]t is

wholly within the discretion of the State to allow or not to allow such a review." *Id.* at 687.

Following *McKane*, the Court has gone on to clarify that there is no constitutional right to

appellate review in any case, civil or criminal.  *See Jones v. Barnes*, 463 U.S. 745, 751 (1983)

("There is, of course, no constitutional right to an appeal . . . ."); *Lindsey v. Normet*, 405 U.S. 56,

64 (1972) (collecting cases for the proposition that "the Due Process Clause of the Fourteenth

Amendment does not require a State to provide appellate review"); *accord United States v.

Marshall*, 872 F.3d 213, 217 (4th Cir. 2017) (recognizing that criminal defendants "have no

federal constitutional right to an appeal, only a statutory right").

It follows logically that if there is no constitutional right to appellate review in the first

instance, the Due Process Clause does not guarantee the right to review by the Supreme Court.

*See Clements v. Gonzales*, 496 F. Supp. 2d 70, 74-76 (D.D.C. 2007) (upholding constitutionality

of Supreme Court's rule that petitions for writs of certiorari are "not a matter of right, but of

judicial discretion"), *aff'd sub nom. Clements v. Mukasey*, No. 08-5065, 2008 WL 4898961

(D.C. Cir. July 11, 2008).  Because the Supreme Court's certiorari system does not offend the

Constitution, plaintiff has not stated a plausible due process claim against 28 U.S.C. § 1254(1).

Accordingly, I shall deny the Motion to Amend (ECF 17).[7]

---

[7] I pause to note that the D.C. Circuit summarily rejected Mr. Straw's challenge to the
Judiciary Act of 1925.  *See Straw v. Supreme Court of United States*, 731 F. App'x 7 (D.C. Cir.
2018) (per curiam), *reh'g and reh'g en banc denied* (D.C. Cir. Oct. 1, 2018).

## V.    Conclusion

For the reasons stated above, I shall grant the Government Motion (ECF 24). Accordingly, I shall deny the Straw Motion (ECF 20).  Further, I shall deny plaintiff's Motion to Amend (ECF 17) as well as  ECF 33, ECF 36, ECF 37 and ECF 38.[8]

An Order follows, consistent with this Memorandum Opinion.

Date:  May 14, 2020                                                   /s/
                                                              Ellen Lipton Hollander
                                                              United States District Judge

---

[8] In his Opposition, plaintiff requests leave to amend his Complaint to include claims under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.*  ECF 25, ¶ 33.  I shall deny plaintiff leave to amend as to do so would be futile. The FTCA expressly excludes claims arising in a foreign county.  28 U.S.C. § 2680(k); *see Sosa v. Alvarez-Machain*, 542 U.S. 692, 712 (2004). Mr. Straw alleges that he suffered injuries while in the Philippines as a result of tortious conduct by consular officials in the Philippines.  The FTCA's foreign country exception thus precludes plaintiff's claim.